UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

|  |  |
|---|---|
| MARTINEZ MANUFACTURING, INC., individually and on behalf of all others similarly situated,<br><br>      Plaintiff,<br><br>  v.<br><br>FURUKAWA ELECTRIC CO., LTD., SHUJI HAYASHIDA, HIROTSUGA NAGATA, JUNICHI FUNO, TETSUYA UKAI, AMERICAN FURUKAWA, INC., FURUKAWA WIRING SYSTEMS AMERICA, INC. f/k/a FURUKAWA LEAR CORPORATION, f/k/a LEAR FURUKAWA CORPORATION, LEAR CORPORATION, DELPHI FURUKAWA WIRING SYSTEMS LLC, DELPHI AUTOMOTIVE LLP, YAZAKI CORPORATION, YAZAKI NORTH AMERICA INC., S-Y SYSTEMS TECHNOLOGIES AMERICA, LLC, S-Y SYSTEMS TECHNOLOGIES GmbH, DENSO INTERNATIONAL AMERICA INC., LEONI AG, LEONI KABEL GmbH, SUMITOMO ELECTRIC INDUSTRIES, LTD., and TRAM, INC. f/k/a and d/b/a TOKAI RIKA U.S.A., INC.,<br><br>      Defendants. | **Case No.**<br><br>**CLASS ACTION COMPLAINT**<br><br><u>**DEMAND FOR JURY TRIAL**</u> |

Plaintiff Martinez Manufacturing, Inc., individually and on behalf of a proposed class of direct purchasers of Automotive Wire Harnesses and Related Products (as defined below) from January 1, 2000 to January 31, 2010, brings this class action against Defendants under the federal antitrust laws for treble damages and injunctive relief and alleges as follows:

## TABLE OF CONTENTS

NATURE OF THE CASE ...................................................................................... 3

DEFINITIONS.................................................................................................... 3

JURISDICTION AND VENUE .............................................................................. 4

THE PARTIES...................................................................................................... 5

DEFENDANTS' AGENTS AND CO-CONSPIRATORS............................................. 8

INTERSTATE TRADE AND COMMERCE ............................................................. 9

CLASS ACTION ALLEGATIONS ......................................................................... 9

THE WIRE HARNESS INDUSTRY ..................................................................... 11

THE CHARACTERISTICS OF THE MARKET FOR WIRE  HARNESSES AND RELATED
PRODUCTS ARE CONDUCIVE TO COLLUSION ................................................. 15

DEFENDANTS' PRICE FIXING CONSPIRACY.................................................... 16

THE GLOBAL AND U.S. ANTITRUST INVESTIGATIONS ................................... 16

THE U.S. CRIMINAL CHARGES AND GUILTY PLEAS ....................................... 18

ANTITRUST INJURY SUFFERED BY PLAINTIFF AND THE CLASS................................ 21

FRAUDULENT CONCEALMENT...................................................................... 21

COUNT I: CLAIM FOR VIOLATION OF SHERMAN ACT § 1 ............................. 24

PRAYER FOR RELIEF ...................................................................................... 26

DEMAND FOR JURY TRIAL ............................................................................ 27

## NATURE OF THE CASE

1.      From January 1, 2000 to January 31, 2010, the largest United States and global manufacturers of automotive wire harnesses and related products operated a price fixing cartel in violation of the federal antitrust laws.  Defendants and their co-conspirators manufactured or sold wire harnesses and related products and entered into and implemented a continuing combination and conspiracy to rig bids and fix, raise, maintain or stabilize prices for wire harnesses and related products sold in the United States.  Because of Defendants' unlawful conduct, Plaintiff and the Class members paid artificially inflated prices for wire harnesses and related products and as a result have suffered antitrust injury to their business or property.

2.      In the related U.S. Department of Justice Antitrust Division criminal investigation, four Defendants have been criminally charged and pled guilty or agreed to plead guilty to violations of the Sherman Act.

3.      Plaintiff brings this action under the federal antitrust laws, Section One of the Sherman Act of 1890, 15 U.S.C. § 1 ("Sherman Act") and Section 4 of the Clayton Act of 1914, 15 U.S.C. § 15 ("Clayton Act"), and asserts the following allegations on information and belief, except as to those paragraphs that pertain to Plaintiff, which are based upon personal knowledge. Plaintiff's information and belief are based upon, *inter alia*, the investigation made by its attorneys.

## DEFINITIONS

4.      "Automotive Wire Harnesses" are electrical distribution systems used to direct and control electronic components, wiring, and circuit boards in motor vehicles.

3

5.      "Related Products" consist of automotive electrical wiring, lead wire assemblies, cable bond, automotive wiring connectors, automotive wiring terminals, electronic control units, fuse boxes, relay boxes, junction blocks, and power distributors.

6.      "Automotive Wire Harnesses and Related Products" include either or both Automotive Wire Harnesses and Related Products as defined herein.

7.      The "Class Period" is January 1, 2000 to January 31, 2010.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331, 1332(d) and 1337.

9.      Venue is proper in this district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. §§ 1391 (b), (c) and (d) because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more of the Defendants reside in, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this District.

10.      The activities of Defendants and their co-conspirators were within the flow of, were intended to, and did have a substantial effect on, the interstate commerce of the United States.

11.      This Court has *in personam* jurisdiction over each of the Defendants because, *inter alia,* each Defendant: (a) transacted business throughout the United States, (b) manufactured, sold, shipped, and delivered substantial quantities of Wire Harnesses and Related Products throughout the United States, (c) had substantial contacts with the United States, and (d) was engaged in an illegal scheme and price-fixing conspiracy that was directed at and had the

intended effect of causing injury to persons and entities residing in, located in, or doing business throughout the United States. Further jurisdictional contacts are alleged below.

## THE PARTIES

12.     Plaintiff Martinez Manufacturing Inc. ("Plaintiff" or "Martinez Manufacturing") is an Illinois Corporation with its principal place of business in the State of Illinois. Plaintiff purchased Automotive Wire Harnesses or Related Products directly from one or more of the Defendants during the Class Period.

13.     Defendant Furukawa Electric Co., Ltd ("Furukawa Electric") is a corporation organized and existing under the laws of Japan with its principal place of business in Tokyo, Japan.

14.     Defendant Hirotsugu Nagata is an individual now or formerly employed by Defendant Furukawa Electric. Defendant Hirotsugu Nagata was employed by a subsidiary of Furukawa in the United States as General Manager of Sales from January 2004 until November 2007, Marketing Manager from January 2004 until March 2009, and Chief Financial Officer from January 2004 through at least June 2009.

15.     Defendant Junichi Funo is an individual now or formerly employed by Defendant Furukawa Electric. Defendant Junichi Funo was employed by Furukawa in Japan as a sales representative in the Honda Sales Division from April 2003 until August 2003, then by a subsidiary of Furukawa in the United States as Assistant General Manager for Honda Sales from August 2003 until March 2009, and as Manager of the Honda Sales Division of Furukawa in Japan from March 2009 until at least July 2009.

16.     Defendant Tetsuya Ukai is an individual now or formerly employed by Defendant Furukawa Electric. Defendant Tetsuya Ukai was Manager in the Honda Sales Division of

Furukawa from April 2003 until July 2005, Unit Chief in the Honda Sales Division of Furukawa from July 2005 until April 2007, and General Manager of the Honda Sales Division of Furukawa from April 2007 until at least July 2009.

17.    Defendant American Furukawa, Inc. ("American Furukawa") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Plymouth, Michigan.  American Furukawa is a subsidiary of, and owned and controlled by, Defendant Furukawa Electric Co., Ltd.

18.    Furukawa Electric and American Furukawa are referred to jointly as "Furukawa."

19.    Defendant Shuji Hayashida is an individual formerly employed by Defendant American Furukawa.  Mr. Hayashida was President and CEO of American Furukawa from 2001 until 2010.

20.    Defendant Furukawa Lear Corporation ("Furukawa Lear") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in El Paso, Texas.

21.    Defendant Lear Corporation ("Lear") is a Delaware corporation with its principal place of business in Southfield, Michigan.

22.    Defendant Furukawa Wiring Systems America, Inc. ("Furukawa Wiring") f/k/a Furukawa Lear Corporation and f/k/a Lear Furukawa Corporation is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in El Paso, Texas.  60% of the shares of Furukawa Wiring are owned by Furukawa Electric and 40% of the shares are owned by American Furukawa.  During the Class Period, Furukawa Wiring, under its previous names, was a joint venture between Lear and Furukawa with each owning a majority of the shares at different times.  Furukawa bought out the remaining shares of Lear on June 1, 2010.

6

23.     Defendant Delphi Furukawa Wiring Systems LLC is a limited liability company created through a joint venture with Delphi Corporation and the Furukawa Electric Company Ltd. with its principal place of business in Ann Arbor, Michigan.

24.     Defendant Delphi Automotive LLP ("Delphi") is a limited liability partnership organized and existing under the laws of England and Wales, with its principal place of business in Troy, Michigan.

25.     Defendant Yazaki Corporation is a corporation organized and existing under the laws of Japan, with its principal place of business in Tokyo, Japan.

26.     Defendant Yazaki North America Inc. ("Yazaki North America") is a corporation organized and existing under the laws of the State of Illinois, with its principal place of business in Canton Township, Michigan.  It is a subsidiary of, and owned and controlled by, its parent, Yazaki Corporation.

27.     Defendant S-Y Systems Technologies America, LLC ("S-Y Systems America") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Dearborn, Michigan.  It is a subsidiary of, and owned and controlled by, its parent, Yazaki Corporation.

28.     Defendant S-Y Systems Technologies GmbH ("S-Y Systems Germany") is a corporation organized and existing under the laws of Germany.

29.     Yazaki Corporation, Yazaki North America, S-Y Systems America and S-Y Systems Germany are referred to collectively as "Yazaki."

30.     Defendant Denso International America Inc. ("Denso") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Southfield, Michigan.

31.     Defendant Leoni AG is a corporation organized and existing under the laws of Germany, with its principal place of business in Nuremberg, Germany.

32.     Defendant Leoni Kabel GmbH is a corporation organized and existing under the laws of Germany, with its principal place of business in Roth, Germany.

33.     Leoni AG and Leoni Kabel GmbH are referred to jointly as "Leoni."

34.     Defendant Sumitomo Electric Industries, Ltd. ("Sumitomo") is a corporation organized and existing under the laws of Japan, with its principal place of business in Tokyo, Japan.

35.     Defendant TRAM, Inc. f/k/a and d/b/a Tokai Rika ("TRAM") is a corporation organized and existing under the laws of the State of Michigan, with its principal place of business in Plymouth, Michigan.

## DEFENDANTS' AGENTS AND CO-CONSPIRATORS

36.     The acts alleged in this Complaint to have been done by Defendants were authorized, ordered and condoned by their parent companies and authorized, ordered and performed by their officers, directors, agents, employees or representatives while engaged in the management, direction, control or transaction of their business affairs.

37.     Various other persons, corporations, or firms not named as Defendants herein have participated in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

38.     Each Defendant acted as the principal or agent of or for other Defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiff.

## INTERSTATE TRADE AND COMMERCE

39.     The activities of Defendants and their co-conspirators, as described in this

Complaint, were within the flow of, and substantially affected, interstate commerce.

40.     During the Class Period, Defendants manufactured, sold and shipped substantial

quantities of Wire Harnesses and Related Products in a continuous and uninterrupted flow of

interstate commerce.

## CLASS ACTION ALLEGATIONS

41.     Plaintiff brings this action on behalf of itself and pursuant to Federal Rules of

Civil Procedure 23(a) and 23(b)(3) as the representative of a Class defined as follows:

> All direct purchasers of Automotive Wire Harnesses or Related
> Products in the United States from any of the Defendants (or their
> controlled subsidiaries, affiliates, or joint-ventures) between
> January 1, 2000 and January 31, 2010 ("the Class").

42.     Members of the Class are so numerous and geographically dispersed across the

United States that joinder is impracticable.  While the exact number of Class members is

unknown to Plaintiff, it is believed to be in the hundreds.  The identity of the members of the

Class can be readily determined from information and records in the possession of Defendants.

43.     Plaintiff's claims are typical of the claims of the members of the class.  Plaintiff

and all members of the Class were damaged by the same wrongful conduct by Defendants, *i.e.*,

they have paid artificially inflated prices for Automotive Wire Harnesses and Related Products

as a result of Defendants' anticompetitive and unlawful conduct.

44.     Plaintiff will fairly and adequately protect and represent the interests of the Class.

Plaintiff's interests are coincident with, and not antagonistic to, those of the Class.

45.     Plaintiff is represented by counsel experienced and competent in the prosecution

of antitrust class action litigation.

46.     Questions of law and fact common to members of the Class predominate over questions, if any, that may affect only individual Class members because Defendants have acted on grounds generally applicable to the entire Class.  Such generally applicable conduct is inherent in Defendants' anticompetitive and unlawful conduct.

47.     Questions of law and fact common to the Class include, but are not limited to:

    a.   Whether Defendants contracted, combined, or conspired to fix, raise, maintain, or stabilize prices, or to rig bids for, Automotive Wire Harnesses and Related Products;

    b.   The existence and duration of the contract, combination, or conspiracy alleged herein;

    c.   Whether the contract, combination, or conspiracy caused Automotive Wire Harnesses and Related Products  prices to be higher than they would have been in the absence of Defendants' conduct;

    d.   Whether Defendants' conduct caused injury to the business or property of Plaintiff and members of the Class;

    e.   Whether Defendants' conduct violates Section 1 of the Sherman Act; and

    f.   The appropriate measure of the amount of damages suffered by the Class.

48.     A class is superior to the other methods available for the fair and efficient adjudication of this litigation since individual joinder of all Class members is impracticable.  The damages suffered by the individual Class members are relatively small, given the expense and burden of individual prosecution of the claims asserted in this litigation.  Thus, absent the availability of class action procedures, it would not be feasible for Class members to redress the wrongs done to them.  Further, individual litigation presents the potential for inconsistent

judgments and would greatly magnify the delay and expense to all parties and the court system.

Therefore, the class action device presents far fewer case management difficulties and will

provide the benefits of unitary adjudication, economy of scale, and comprehensive supervision in

a single court.

### THE WIRE HARNESS INDUSTRY

49.     A wire harness (or "wiring harness") is a system of insulated conducting wires

bound together with insulating materials, used in the electrical system of a machine, such as a

motor vehicle or washing machine.

50.     A car's electrical system is powered by, and dependent on, the car battery.  The

power that ultimately supplies the electricity needed for all of the electrical components on a car

to function originates from the battery.  A car's electrical system is made up of a web of

connected wires, fuses and relay systems.  Basic electrical wiring carries the current supplied by

the car battery and directs it to various components.  A system of fuses (which serve as a

protection against electrical malfunctions) and relays (which redirect incoming electrical

charges) comprise the heart and inner workings of a vehicle's electrical system.  The alternator is

responsible for powering a car's accessories – radio, lights, horn – during normal engine

operation.  The car battery supplies the initial charge that allows the car to be started, and then

the alternator takes over the job of supplying a constant electrical feed.  In addition, the alternator

is responsible for recharging the battery after the battery loses some of its strength from starting

the car.

51.     Automotive Wire Harnesses are electrical distribution systems used to direct and

control electronic components, wiring, and circuit boards throughout an automobile.  Automotive

Wire Harnesses carry electricity from sources (such as the battery or alternator) to electric and

electronic devices that use electricity to work (such as the radio, headlights and dashboard display). *See, e.g.* Figure 1 (2009 Honda Civic EX engine wire harness diagram).



Figure 1.

52.     Automotive Wire Harness "Related Products" consist of automotive electrical wiring, lead wire assemblies, cable bond, automotive wiring connectors, automotive wiring terminals, electronic control unites, fuse boxes, relay boxes, junction blocks, and power distributors.

53.     During the Class Period, Defendants sold Automotive Wire Harnesses and Related Products directly to motor vehicle original equipment manufacturers ("OEMs"), suppliers to OEMs and distributors.

54.     OEMs include domestic OEMs such as the Big Three in Detroit (General Motors, Ford and Chrysler) and non-domestic OEMs who also operate manufacturing plants in the U.S. For example, during the Class Period, Nissan manufactured cars in Mississippi, Toyota in Kentucky, BMW in South Carolina, Honda, Hyundai and Mercedes-Benz in Alabama and Kia in Georgia.  Suppliers such as Plaintiff purchased Automotive Wire Harnesses and/or Related Products directly from Defendants, which they then sold to OEMs or other suppliers to OEMs.

55.     Defendants and their co-conspirators supplied Automotive Wire Harnesses and Related Products to OEMs and component manufacturers ultimately to be installed in vehicles manufactured and sold in the United States and elsewhere.  Defendants and their co-conspirators manufactured Automotive Wire Harnesses and Related Products (a) in the United States for sale to automotive suppliers and OEMs and for ultimate installation in vehicles manufactured and sold in the United States, (b) overseas for export to the United States and sale to automotive suppliers and OEMs and for ultimate installation in vehicles manufactured and sold in the United States, and (c) overseas for installation in vehicles manufactured overseas for export to and sale in the United States.

56.     Plaintiff and members of the proposed Class purchased Automotive Wire Harnesses and Related Products directly from one or more of the Defendants.

57.     During the Class period, Defendants, who in a competitive market would be horizontal competitors with one another, engaged in a conspiracy to rig bids for and to raise, fix, maintain, or stabilize prices of Automotive Wire Harnesses and Related Products.  As a result of their unlawful conduct, Defendants did not compete with other Automotive Wire Harness and Related Product manufacturers, but instead enjoyed business insulated from competition from the other manufacturers of such products.

58.     Defendants collectively control the vast majority of the U.S. market for Automotive Wire Harnesses and Related Products.

59.     Taken together, Defendants' global market share exceeds 85%.  *See* Figure 2.

Figure 2; Source: Global and China Automotive Wiring Harness 2010 Industry Report (Research in China 2011).

60.     Although Defendants increased the prices of Automotive Wire Harnesses during the Class Period, the cost of the major inputs into such products were unchanged.  For example, the cost of copper, a substantial input during the manufacture of Automotive Wire Harnesses and Related Products and a significant cost component, was controlled by Defendants Sumitomo and Furukawa, who owned their own copper mines.

61.     If the input costs into Automotive Wire Harnesses remained constant, one would expect—in a competitive market—that the price of such systems would not increase.  However, when competitors within a market effectively conspire to fix prices, they can increase prices in the face of constant costs without the fear that customers will turn to competitors selling at the true market price.

### THE CHARACTERISTICS OF THE MARKET FOR WIRE
### HARNESSES AND RELATED PRODUCTS ARE CONDUCIVE TO COLLUSION

62.     Several important economic characteristics of the market for Automotive Wire
Harnesses and Related Products plausibly increased its vulnerability to Defendants' price fixing
conspiracy.

*High Barriers to Entry*

63.     A collusive arrangement that raises product prices above competitive levels
would, under normal circumstances, attract new entrants seeking to benefit from the
supracompetitive pricing.  Where, however, there are significant barriers to entry, new entrants
are less likely.  Indeed, the number of new entrants into the market for Automotive Wire
Harnesses and Related Products has been minimal.  Thus, barriers to entry help facilitate the
cartel.

64.     There are high barriers to entry in the market for Automotive Wire Harnesses and
Related Products market.

65.     Entry requires a company to incur significant start-up capital expenditures.  A
new entrant into the business would have to incur millions of dollars in costs, including capital
expenditures on plants and equipment, as well as transportation, electricity, infrastructure for
distribution, and labor.

66.     Another factor contributing to barriers to entry is the common use of contracts
between providers and purchasers of Automotive Wire Harnesses and Related Products.  A new
entrant would face a significant hurdle to break into the market in the face of existing contracts
with incumbent suppliers.

*Price Inelasticity*

67.     When a seller of goods or services can increase prices without suffering substantial reduction in sales, pricing is considered inelastic.  In order for a cartel to profit from raising prices above competitive levels, pricing must be relatively inelastic.  Otherwise, increased prices would result in declining use of services, revenues, and profits.

68.     Pricing for Automotive Wire Harnesses and Related Products is highly inelastic. OEMs must use wire harnesses.  There are no viable substitute products.  As a result, Defendants have been able to raise prices without losing revenues.  The cartel thus reaped exorbitant profits by illegally fixing prices.

*Opportunities for Collusion*

69.     Defendants attended industry events, such as the Detroit Auto Show, fostering the opportunities to conspire.  Such industry events have provided myriad opportunities to meet, conspire, and share information.

## DEFENDANTS' PRICE FIXING CONSPIRACY

70.     Beginning at least as early as January 1, 2000 and continuing until at least January 31, 2010, Defendants and their co-conspirators established and operated a criminal price fixing cartel to artificially raise prices in the market for Wire Harnesses and Related Products.

## THE GLOBAL AND U.S. ANTITRUST INVESTIGATIONS

71.     A worldwide antitrust investigation into the market for Automotive Wire Harnesses and Related Products by authorities in the United States, Europe, and Japan originated in Europe when several European OEMs jointly complained to the European Commission ("EC").  Reportedly, one European automaker failed to attract bids for its request for proposals

16

for Automotive Wire Harnesses and Related Products, after which it joined with other automakers in making a complaint to the EC.

72.     Notably, in February 2010, during its ongoing investigation into anticompetitive conduct in the market for Automotive Wire Harnesses and Related Products, the EC conducted raids at the European offices of certain Defendants.  In June 2010, the EC raids continued at the European offices of several suppliers, including Leoni, S-Y Systems, and Yazaki.

73.     With respect to the raids, an EC official stated, "[t]he Commission has reason to believe that the companies concerned may have violated European Union antitrust rules that prohibit cartels and restrictive business practices."

74.     Several of the Defendants have admitted that they are part of an antitrust investigation in the automotive electrical and electronic component supplier market.

75.     Specifically, Defendant Delphi admitted that it "received a request for information from antitrust authorities at the European Commission seeking information about conduct by us in connection with an investigation in the European Union related to the electrical and electronic components market."

76.     Bob Rossiter, Lear's CEO, likewise stated that the EC notified Defendant Lear that it was part of said investigation.

77.     Defendants S-Y Systems and Leoni have also stated that they are cooperating with antitrust investigations.

78.     In conjunction with its investigation into collusion in the market for Automotive Wire Harnesses and Related Products, Japan's Fair Trade Commission raided the Tokyo offices of Furukawa, Sumitomo, and Yazaki in February 2010.

79.     According to the DOJ, "[t]he antitrust division is investigating the possibility of anticompetitive cartel conduct of automotive electronic component suppliers" and is coordinating its investigation with European antitrust regulators.

80.     In February 2010, the same month that Japanese and European authorities conducted raids, FBI investigators executed warrants and searched the offices of three Japanese auto part makers in metropolitan Detroit in conjunction with the United States' antitrust investigation.  Yazaki's subsidiary in Canton Township, Michigan was one of the companies searched.

81.     Although Special Agent Sandra Berchtold stated that the affidavits supporting issuance of the warrants were sealed in federal court, the United States could not have obtained such warrants without demonstrating to a judicial officer that it had probable cause to believe it would obtain evidence of an antitrust violation upon executing the search warrant.

82.     Thus, the United States demonstrated to a judicial officer's satisfaction that it had evidence sufficient to warrant a person of reasonable caution to believe that the raids of seemingly lawful businesses would uncover evidence of antitrust violations.  Such belief, recounted in sworn affidavits or testimony, had to be grounded on information that was reasonably trustworthy.

### THE U.S. CRIMINAL CHARGES AND GUILTY PLEAS

83.     The United States has criminally charged Defendants Furukawa Electric and three Furukawa executives, Hirotsugu Nagata, Junichi Funo and Tetsuya Ukai with price fixing in violation of the Sherman Act.

84.     On September 30, 2011, Furukawa announced that it had "concluded a plea agreement with the United States Department of Justice under which the company acknowledges

the allegations in the criminal proceeding relating to cartel activities with certain competitors for the automotive wire harness and related products and pays a fine of 200,000,000 US dollars."

85.    According to Furukawa, "[a]fter analyzing the applicable laws and facts as a whole, Furukawa Electric has decided to enter into a plea agreement with the United States Department of Justice."

86.    Defendants Hirotsugu Nagata, Junichi Funo and Tetsuya Ukai agreed to plead guilty and to serve prison sentences in the United States of between one year and 18 months.

87.    Furukawa has reached a plea agreement and agreed to plead guilty for participating in a conspiracy to fix the prices of and rig bids for the sale of Automotive Wire Harnesses sold to automobile manufacturers in the United States and elsewhere.

88.    According to the United States DOJ press release, Furukawa participated in the conspiracy from at least as early as January 2000 until at least January 2010.

89.    The Information to which Furukawa has agreed to plead guilty states that for the purposes of forming and carrying out the charged combination and conspiracy, Furukawa Electric:

a.    participated in meetings, conversations, and communications in the United States and Japan to discuss the bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

b.    agreed, during those meetings, conversations, and communications, on bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

c.      agreed, during those meetings, conversations, and communications, to allocate the supply of automotive wire harnesses and related products sold to automobile manufacturers in the United States and elsewhere on a model-by-model basis;

d.      agreed, during those meetings, conversations, and communications, to coordinate price adjustments requested by automobile manufacturers in the United States and elsewhere;

e.      submitted bids, price quotations, and price adjustments to automobile manufacturers in the United States and elsewhere in accordance with the agreements reached;

f.      sold automotive wire harnesses and related products to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

g.      accepted payment for automotive wire harnesses and related products sold to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

h.      engaged in meetings, conversations, and communications in the United States and elsewhere for the purpose of monitoring and enforcing adherence to the agreed-upon bid-ridding and price-fixing scheme; and

i.      employed measures to keep their conduct secret, including but not limited to using code names and meeting at private residences or remote locations.

20

90.     In the DOJ press release announcing Furukawa's agreement to plead guilty,

Acting Assistant Attorney General Sharis A. Pozen in charge of the DOJ Antitrust Division

stated:

> As a result of this international price-fixing and bid-ridding
> conspiracy, automobile manufacturers paid noncompetitive and
> higher prices for parts in cars sold to U.S. consumers.  This cartel
> harmed an important industry in our nation's economy, and the
> Antitrust Division with the Federal Bureau of Investigation will
> continue to work together to ensure that these kinds of conspiracies
> are stopped.

### ANTITRUST INJURY SUFFERED BY PLAINTIFF AND THE CLASS

91.     Defendants' anti-competitive conduct has had the following effects:

a.  price competition has been restrained, suppressed, or eliminated with respect
to wire harnesses;

b.  the prices of wire harnesses have been raised, fixed, maintained, or stabilized
at supra-competitive levels; and

c.  purchasers of wire harnesses have been deprived of free and open competition
in the wire harness market.

92.     As a result of the contract, combination, or conspiracy, Plaintiff and Class

members paid anticompetitive prices for wire harnesses, and Plaintiff and Class members have

sustained injury to their business or property.

### FRAUDULENT CONCEALMENT

93.     Defendants affirmatively and wrongfully concealed their anti-competitive conduct

from Plaintiff and the Class, from at least January 1, 2000 through at least February 2010, when

the antitrust investigation of the Automotive Wire Harnesses and Related Products industry

became public.  During that time, Plaintiff and the Class did not learn or discover the operative

facts giving rise to the instant Complaint, despite Plaintiff's due diligence.  Thus, Defendants' fraudulent concealment tolled the statute of limitations through at least February 2010.

94.     Defendants represented publicly, both to customers and otherwise, that their pricing and bidding activities were unilateral, rather than based on anticompetitive agreements. In making those false representations, Defendants misled Plaintiff and members of the Class as to the true, collusive, and coordinated nature of their bid rigging, customer allocation, and price-fixing activities.

95.     Defendants' wrongful conduct was carried out in part through means and methods that were designed to avoid detection, and which, in fact, successfully precluded detection.

96.     In particular, Defendants participated in meetings, conversations, and communications to discuss the bids and price quotations to be submitted to customers in the United States and elsewhere.

97.     During these meetings, conversations, and communications, Defendants agreed upon bids and price quotations to be submitted to customers in the United States and elsewhere.

98.     Defendants likewise agreed to allocate the supply of automotive wire harnesses and related products sold to customers in the United States and elsewhere on a model-by-model basis.

99.     Defendants also agreed to coordinate price adjustments requested by customers in the United States and elsewhere.

100.    In accordance with the agreements reached by Defendants, they submitted collusive bids, price quotations, and price adjustments to customers in the United States and elsewhere.

101.    As a result of such coordinated actions, and unbeknownst to Plaintiff, Defendants sold automotive wire harnesses and related products to purchasers in the United States and elsewhere at collusive and noncompetitive prices.

102.    To keep the sale of automotive wire harnesses and related products at collusive and noncompetitive prices a secret, Defendants employed certain measures, including but not limited to, using code names and meeting at private residences or remote locations.

103.    Moreover, Defendants' successful contract, combination, or conspiracy was by its nature inherently self-concealing.

104.    Despite its due diligence, Plaintiff had no knowledge of Defendants' unlawful contract, combination, or conspiracy.

105.    In the course of purchasing Automotive Wire Harnesses and Related Products, Plaintiff researched and compared prices of the specific products offered by Defendants. Plaintiff also read and reviewed all pricing documents it received from Defendants.

106.    Among the pricing information Plaintiff received from Defendants were frequent price increase announcements, including announcements that represented that the bases of price increases in Wire Harnesses and Related Products were (1) increased copper prices, (2) increased labor costs, and (3) increased tinning or gold plating expenses. Plaintiff used due diligence in reviewing and ultimately relying on those representations. Plaintiff had no way to know that the real reason for Defendants' price increases was criminal price fixing of Wire Harnesses and Related Products.

107.    OEMs generally specified the component Wire Harnesses and Related Products Plaintiff was required to purchase and the vendors of those products. Nonetheless, Plaintiff looked for lower priced alternative Wire Harness and Related Products that it could present to an

OEM with a request for modification of the specified component and vendor.  In Plaintiff's experience, however, lower price non-specified Wire Harness and Related Products were not available.

108.    In the exercise of due diligence, Plaintiff, through its purchasing department, researched alternate sources of Wire Harnesses and Related Products on the Internet both domestically and internationally.

109.    Plaintiff exercised due diligence in researching and comparing prices of Wire Harnesses and Related Products to ascertain whether it was being offered competitive prices for such products.

110.    Plaintiff also kept abreast of pricing and developments in the Automotive Wire Harness industry by reviewing trade publications and attending industry trade shows.

111.    Plaintiff did not and could not have discovered Defendants' unlawful contract, combination, or conspiracy at any earlier date, despite its due diligence.  Defendants undertook affirmative acts of concealment of their contract, combination, or conspiracy, including their attendance at secret meetings, making misrepresentations to Plaintiff and the Class of the reasons for price increases, and engaging in secret conversations concerning the allocation of customers, bid rigging, and price-fixing of Automotive Wire Harnesses and Related Products.

## COUNT I: CLAIM FOR VIOLATION OF SHERMAN ACT § 1

112.    Plaintiff incorporates by reference the allegations set forth above and adopts same as though fully set forth herein.

113.    Defendants and unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in an unreasonable restraint of trade in violation of Section 1 of the Sherman Act.

24

114.    The acts done by each of the corporate Defendants as part of, and in furtherance of, the contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

115.    Commencing at least as early as January 1, 2000 and continuing until at least January 31, 2010, the exact dates being presently unknown to Plaintiff, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially fix, raise, stabilize, and control prices for Automotive Wire Harnesses and Related Products, thereby creating anticompetitive effects.

116.    Defendants and their co-conspirators' anti-competitive acts were intentionally directed at the United States market for Automotive Wire Harnesses and Related Products and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for said products throughout the United States.

117.    As a result of the contract, combination, or conspiracy alleged herein, the prices charged to Plaintiff and members of the Class for Automotive Wire Harnesses and Related Products were unlawfully raised, fixed, maintained, or stabilized in the United States.

118.    The contract, combination, or conspiracy has had the following effects:

   a.   Prices paid by Plaintiff and members of the Class for Automotive Wire Harnesses and Related Products were raised, fixed, maintained, or stabilized at non-competitive levels;

   b.   Plaintiff and members of the Class have been deprived of the benefits of free, open, and unrestricted competition in the market for Automotive Wire Harnesses and Related Products; and

   c.   Competition in the market for Automotive Wire Harnesses and Related Products has been unlawfully restrained, suppressed, or eliminated.

119.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have been damaged and will continue to be damaged by paying supra-competitive prices that they would not have had to pay in the absence of the unlawful conduct of Defendants as alleged herein.

120.     The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

121.     Plaintiff and members of the Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that:

A.     The Court determine that this action may be maintained as a class action under Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class;

B.     The unlawful contract, combination, or conspiracy alleged herein be adjudicated and decreed to have been in violation of Section 1 of the Sherman Act;

C.     Judgment be entered for Plaintiff and the Class against Defendants for three times the amount of damages sustained by Plaintiff and the Class as allowed by law, together with the costs of this action, including reasonable attorneys' fees;

D.     Defendants be enjoined from continuing the unlawful contract, combination, or conspiracy alleged herein; and

E.     Plaintiff and the Class be granted such other, further, and different relief as the case may require or as the Court may deem just and proper under the circumstances.

26

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all issues so triable.

Dated: November 23, 2011

/s/ David H. Fink_____
David H. Fink (P28235)
Darryl Bressack (P67820)
FINK + ASSOCIATES LAW
100 West Long Lake Road; Ste. 111
Bloomfield Hills, MI 48304
Telephone:  248-971-2500
dfink@finkandassociateslaw.com
dbressack@finkandassociateslaw.com

Gregory P. Hansel
Randall B. Weill
Joshua R. Carver
Megan A. Sanders
PRETI, FLAHERTY, BELIVEAU &
PACHIOS LLP
One City Center
P.O. Box 9546
Portland, ME 04112-9546
Telephone:  (207) 791-3000
ghansel@preti.com
rweill@preti.com
jcarver@preti.com
msanders@preti.com

Joseph C. Kohn
William E. Hoese
Douglas A. Abrahams
KOHN, SWIFT & GRAF, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA 19107
Telephone:  (215) 238-1700
jkohn@kohnswift.com
whoese@kohnswift.com
dabrahams@kohnswift.com

Irwin B. Levin
Richard E. Shevitz
Scott D. Gilchrist
TaKeena M. Thompson
COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, IN  46204
Telephone: (317) 636-6481
ilevin@cohenandmalad.com
rshevitz@cohenandmalad.com
sgilchrist@cohenandmalad.com

Joseph M. Fischer
Karen H. Safran
CARSON FISCHER, P.L.C.
4111 Andover Road West - Second Floor
Bloomfield Hills, MI 48302-1924
Telephone:  (248) 644-4840
jfischer@carsonfischer.com
ksafran@carsonfischer.com

Michael T. Smith
Law Offices of Michael T. Smith
440 West Irving Park Road
Roselle, IL 60172
Telephone:  (847) 380-5899
lawoffice0724@sbcglobal.net

Counsel for Plaintiff Martinez
Manufacturing, Inc. and the Proposed Class